AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of ⟩

*(Briefly describe the property to be searched or identify the person by name and address)*

ODYS LOOX Plus Tablet, Serial number 4707213703415, in custody of United States Postal Inspection Service, 1400 New York Ave. NW, Washington, DC

)
)
)
)
)

Case: 1:14-MJ-265
Assigned To: Magistrate Judge John M. Facciola
Assign. Date: 03/19/2014
Description: Search and Seizure Warrant

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A OF ATTACHED AFFIDAVIT INCORPORATED HEREIN

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B OF ATTACHED AFFIDAVIT INCORPORATED HEREIN

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 2251, 2252, and 2252A | Production, Advertisement, Promotion, Transportation, Possession, or Access with Intent to View Child Pornography, and Attempt of the Same |

The application is based on these facts:

See attached Affidavit and Attachments.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Brian Bone, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: MAR 19 2014

City and state: Washington, D.C.

_____
*Judge's signature*

**JOHN M. FACCIOLA**
**U.S. MAGISTRATE JUDGE**
*Printed name and title*



FILED

MAR 19 AM

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A Sony laptop computer, Serial number 275558235000498; A Fujifilm Cameral FinePix containing a 16 GB disc, Serial number 2UG62662; An LG Cell Phone, Seria number 107KPED087260; a ODYS LOOX Plus Tablet, Serial number 4707213703415; Sealed Letter addressed to Klaus Von Der Heide | Case: 1:14-MJ-265 Assigned To: Magistrate Judge John M. Facciola Assign. Date: 03/19/2014 Description: Search and Seizure Warrant |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Brian Bone, a Postal Inspector with the United States Postal Inspection Service, being

duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am an Inspector with the United States Postal Inspection Service ("USPIS"). I

have been so employed since approximately February 2007. I am assigned to the U.S.

Department of Justice Child Exploitation and Obscenity Section in Washington, D.C. During

my tenure with the USPIS, I have directed and/or participated in numerous investigations

involving crimes against children facilitated by means of computers and/or the Internet. Prior to

becoming a Postal Inspector, I worked as a sworn law enforcement officer within the State of

Illinois for over eight years and was employed during that time by the Office of the State's

Attorney, Lake County, Illinois, and the Office of the Sheriff, Lake County, Illinois. In this

position, I was assigned to the Cyber Crimes Division and the Child Exploitation Unit, which

investigated child exploitation related offenses and various computer related crimes. I have

received extensive training in computer forensics and digital investigations from the Treasury

Computer Forensic Training Program, National White Collar Crime Center, and the International Association of Computer Investigative Specialists ("IACIS"), including specialized training on digital data recovery, and the investigation and analysis of e-mail communications and Internet activities, such as instant messaging programs, peer to peer file trading, newsgroups, and forums. I have also received training on the use of specialized forensic software programs, including I-Look, Encase by Guidance Software, and Forensic Tool Kit by Access Data. I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, advertisement, promotion, transportation, and access with intent to view child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A.

2.      As a Postal Inspector, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3.      I am investigating the activities of the administrator of a bulletin board that produced, advertised, promoted, and distributed child pornography. The administrator of this Board has been identified as Klaus Von Der Heide, Case Number 1:14 –cr- 00040, the Honorable James E. Boasberg. On February 28, 2014, a grand jury in the District of Columbia returned an Indictment against John Doe, a.k.a. "Athemis," a.k.a. "Klaus," charging him with Conspiracy to Advertise Child Pornography, Conspiracy to Promote Child Pornography, Advertising Child Pornography, Promoting Child Pornography, and Transportation of Child Pornography. The Honorable Judge Alan Kay authorized an arrest warrant. On March 4, 2014, Klaus Von Der Heide was arrested in New York, New York pursuant to this arrest warrant. This search warrant seeks authority to search a Sony laptop computer, with serial number 275558235000498, a Fujifilm Camera FinePix S4400 containing a 16 GB disc, with a serial number 2UG62662, an LG Cell Phone, with a serial number 107KPED087260, a ODYS LOOX

1

Plus Tablet, with a serial number 4707213703415, and a sealed letter addressed to Klaus Von

Der Heide, which were seized by law enforcement from Klaus Von Der Heide on the same date

in New York, New York.  On March 4, 2014, Klaus Von Der Heide waived his initial

appearance and identity hearing in the Southern District of New York.  On March 13, 2014,

defendant had his initial appearance and was arraigned on the Indictment before the Honorable

James E. Boasberg.  The subject property is currently located within the District of Columbia.

4.      As will be shown below, there is probable cause to believe that the property to be

searched contains evidence of the production, advertisement, promotion, and transportation of

child pornography in violation of 18 U.S.C. §§ 2251, 2252 and 2252A, and/or the attempt to do

the same.  There is further probable cause that these items constitute property designed or

intended for use or which have been used as a means of committing these criminal offenses,

and/or is contraband.[1]  Additionally, I have probable cause to believe that the devices that are the

subject of the instant applications will have stored information and communications that are

relevant to this investigation, to include evidence of the identity of the person known as

"Athemis," who has been identified as the lead administrator of an Internet bulletin board that is,

in part, dedicated to the trading of images of child pornography.  I submit this application and

affidavit in support of a warrant authorizing a search of a Sony laptop computer, with serial

number 275558235000498, a Fujifilm Camera FinePix S4400 containing a 16 GB disc, with a

serial number 2UG62662, a LG Cell Phone, with a serial number 107KPED087260, a ODYS

LOOX Plus Tablet, with a serial number 4707213703415, and a sealed letter addressed to Klaus

Von Der Heide, within the District of Columbia, as further described in separate Attachments A

---

[1] *See Davis v. Gracey*, 111 Fled 1472, 1480 (10th Cir. 1997); *United States v. Lamb*, 945 F.Supp. 441, 462
(N.D.N.Y. 1996) (Rule 41 authorizes the seizure of computer equipment as an instrumentality when a suspect uses a
computer to view, acquire, and transmit images of child pornography."  See United States v. Kimbrough, 69 F.3d
723, 731 (5th Cir. 1995) (items containing child pornography constitute contraband).

and B.  Located within the property to be searched, I seek to seize evidence, fruits, and instrumentalities of the forgoing criminal violations, which relate to the knowing production, advertisement, promotion, transportation, possession, and access with intent to view child pornography.  I further seek to seize evidence in the form of stored information and communications that are relevant to this criminal investigation in that they relate or include information related to the identity of the person known as "Athemis," who has been identified as the lead administrator of an Internet bulletin board that is, in part, dedicated to the trading of images of child pornography.  I request authority to search all areas of the computers, cell phone, and digital camera, for the items specified in Attachment B, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of criminal activity.

5.     This Affidavit is based in part on information that I learned from discussions with other law enforcement officers and on my own investigation of this matter.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251, 2252 and 2252A, are currently located on the aforementioned laptop and currently located in the custody of the United States Postal Inspection Service at 1400 New York Ave. NW, Washington, DC.

## STATUTORY AUTHORITY

6.     This investigation concerns alleged violations of 18 U.S.C. §§ 2251, 2252 and 2252A, relating to material involving the sexual exploitation of minors.

7.     18 U.S.C. § 2251 prohibits a person from knowingly making, printing, or publishing or causing to be made, printed or published, any notice or advertisement seeking or

offering to receive, exchange, buy, produce, display, distribute, or reproduce, any visual

depiction if the production of such visual depiction involves the use of a minor engaged in sexual

explicit conduct and such person knows or has reason to know that such notice or advertisement

will be transported using any means or facility of interstate or foreign commerce or in or

affecting interstate or foreign commerce, by any means including by computer, or such notice or

advertisement is actually transported using any means and facility of interstate or foreign

commerce.  18 U.S.C. § 2251 also prohibits a person who employs, uses, persuades, induces,

entices, or coerces any minor to engage in any sexually explicit conduct for the purpose of

producing any visual depiction of such conduct or for the purpose of transmitting a live visual

depiction of such conduct.  18 U.S.C. § 2252A prohibits a person from advertising, promoting,

presenting, distributing or soliciting through the mails, or using any means or facility of interstate

or foreign commerce or in or affecting interstate or foreign commerce by any means, including

by computer, any material or purported material in a manner that reflects the belief or that is

intended to cause another to believe, that the material or purported material is, or contains a

visual depiction of an actual minor engaging in sexually explicit conduct.  18 U.S.C. §§ 2252 and

2252A prohibit a person from knowingly transporting, receiving, or distributing in interstate or

foreign commerce, or by using any facility or means of interstate or foreign commerce, any

visual depiction of minors engaging in sexually explicit conduct (child pornography), or

attempting to do so.  These sections also prohibit a person from knowingly possessing or

knowingly accessing with intent to view child pornography.

## **DEFINITIONS**

8.      The following definitions apply to this Affidavit and Attachment B:

a. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

b. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

c. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

d. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

f. "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and

includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

g. "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h. "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

6

i. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

k. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

l. "Peer-to-peer file-sharing" ("P2P") is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to set up files on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting searches for files that are currently being shared on another user's computer.

m. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form

(including, but not limited to, writings, drawings, painting), photographic form
(including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes,
motion pictures, photocopies); mechanical form (including, but not limited to,
phonograph records, printing, typing); or electrical, electronic or magnetic form
(including, but not limited to, tape recordings, cassettes, compact discs, electronic or
magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video
disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"),
memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic
dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and
printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

9.      Based on my knowledge, training, and experience in child exploitation and child
pornography investigations, and the experience and training of other law enforcement officers
with whom I have had discussions, computers, computer technology, and the Internet have
revolutionized the manner in which child pornography is produced and distributed.

10.     Computers basically serve five functions in connection with child pornography:
production, communication, distribution, storage, and social networking.

11.     With digital cameras and cellular telephones, images of child pornography can be
transferred directly onto a computer or sent directly to another individual via the Internet.  A
modem allows any computer to connect to another computer through the use of telephone, cable,
or wireless connection.  Through the Internet, electronic contact can be made to literally millions
of computers around the world.

12.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution.

13.     The Internet affords individuals several different venues for meeting each other, obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

14.     Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

15.     As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in a computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files that were

uploaded or downloaded. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

16. Based upon my knowledge, training and experience, and the experience of other law enforcement personnel, I know that searches and seizures of evidence from computers commonly require agents to seize most of the computer items (hardware, software and instructions) to be processed later by a qualified computer expert in a laboratory or other controlled environment. That is almost always true because of the following:

a.      Computer storage devices (like hard drives, diskettes, tapes, laser disks, Bernoulli

drives and others) store the equivalent of thousands of pages of information.  Especially

when the user wants to conceal criminal evidence, he or she may store it in random order

with deceptive file names.  This requires searching authorities to examine all the stored

data to determine whether it is included in the warrant.  This examination process can

take weeks or months, depending on the volume of the data stored, and it would be

impractical to attempt this kind of data search on-site.

b.      Searching computer systems for criminal evidence is a highly technical process

requiring expert skills in a properly controlled environment.  The vast array of computer

hardware and software available today requires even computer experts to specialize in

some systems and applications.  It is difficult to know before a search which expert

should analyze the system and its data.  A search of a computer system is an exacting

scientific procedure, which is designed to protect the integrity of the evidence and to

recover hidden, erased, compressed, password-protected, and other encrypted files.

Because computer evidence is extremely vulnerable to tampering and destruction (both

from external sources and from code embedded in the system as a "booby-trap"), the

controlled environment of a laboratory is essential to its complete and accurate analysis.

c.      In order to fully retrieve data from a computer system, the analyst needs all

magnetic storage devices, as well as the central processing unit ("CPU").  In cases like

this one, where the evidence consists partly of graphic files, the monitor and printer are

also essential to show the nature and quality of the graphic images that the system can

produce.  In addition, the analyst needs all assisting software (operating systems or

interfaces, and hardware drivers) and any applications software, which may have been

used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment. Peripheral devices, which allow users to enter and retrieve data from stored devices, vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly retrieve the evidence sought.

      d.      In addition to being evidence of a crime, there is probable cause to believe that the computer and its storage devices, the monitor, keyboard, printer, modem and other system components were used as a means of committing offenses involving the sexual exploitation of minors in violation of law, and should all be seized on that basis alone. Accordingly, permission is sought herein to seize and search computers and related devices consistent with the scope of the requested search.

**FACTS SUPPORTING PROBABLE CAUSE**

**A.**      **FIRST INTERVIEW OF COOPERATING SUSPECT**

      17.      On or about October 22, 2013, United States Postal Inspection Service (USPIS) Inspector (Insp.) Lyndon Versoza and Immigration and Customs Enforcement – Homeland Security Investigations (ICE-HIS) Special Agent Kelly Kottas conducted a consensual interview of Suspect 1. Dressed in plainclothes, Insp. Versoza and S/A Kottas knocked on his door, presented their credentials, and identified themselves to the Cooperating Suspect as federal law

enforcement officers.  The cooperating suspect allowed them into his residence and agreed to

speak with the agents.  During the interview, the cooperating suspect admitted to producing,

trading, and receiving child pornography over the Internet.  The cooperating suspect stated he

had produced the child pornography himself using "cam bait" to deceive boys into masturbating

online while the cooperating suspect surreptitiously recorded their sexual activities.  The

cooperating suspect reviewed and voluntarily signed a "Consent to Search" form and allowed

Insp. Versoza and S/A Kottas to conduct a forensic preview of his computer and his mobile

device, specifically a cellular telephone.

18.     Using Field Search v8 software, Insp. Versoza conducted a digital preview of his

MacBook Pro laptop and located numerous images of child pornography on his computer.  S/A

Kottas viewed several of the images found during the preview of his computer and determined

the images depicted minor children engaged in sexual activity.  For example, one of the images

depicted what appeared to be two naked prepubescent minor males engaged in anal sex.

19.     In addition, S/A Kottas reviewed the cooperating suspect's cellular telephone and

identified an application, entitled "Audio Manger" on the home screen.  S/A Kottas recognized

the application from previous investigations to be a hidden file vault that is disguised as a sound

and music program.  The "Audio Manager" hidden file vault is used to conceal other applications

and files such as images, videos, documents, other mobile applications.  The cooperating suspect

voluntarily gave S/A Kottas the password to access the hidden files with the application, where

S/A Kottas located additional images of what appeared to be child pornography.  For example,

one of the images depicted what appeared to be a naked minor male, approximately 14 to 16

years of age, standing in front of a mirror with an erect penis.  The minor male was depicted

taking a picture of himself in a mirror of a bathroom.  S/A Kottas also located a file entitled

"trade." The cooperating suspect stated the sexually explicit images contained in the file were

from people the cooperating suspect traded with. The cooperating suspect stated that he believed

the images in the file "trade" depicted males approximately 14 to 16 years of age. The

cooperating suspect signed a "Consent to Assume Online Identity" form allowing law

enforcement to take over of his Internet accounts and use them for investigative purposes.

**B.      SECOND INTERVIEW OF THE COOPERATING SUSPECT**

20.      On or about October 25, 2013, Insp. Versoza and S/A Kottas met with the

cooperating suspect at the ICE-HSI office located in Santa Ana, California. The cooperating

suspect voluntarily came to the office to speak with us and was advised that he was not under

arrest. The interview was recorded. During this interview, the cooperating suspect provided

additional details regarding his involvement in the production and distribution of child

pornography. He stated that, as with his cellular phone, he had hidden files of child pornography

on his computer, more specifically, child pornography video files he made using webcam

software.

21.      The cooperating suspect explained that he successfully chatted with minor boys

using software programs such as "Skype" and "Omegle," and by using a fake video he called

"cam bait" The cooperating suspect stated he used a "cam bait" video of an adult female who

was engaged in masturbation. The cooperating suspect, posing as the adult female, would

persuade minor boys to also engage in masturbation while, unbeknownst to them, the

cooperating suspect recorded the minor boys webcam feed. The cooperating suspect stated he

learned how to utilize cam bait to surreptitiously record people from a website. The cooperating

suspect stated he shared the videos he produced on an Internet based forum dedicated to the

sharing of webcam captured child pornography. For the purpose of this affidavit this Internet

based forum will hereinafter be referred to as "The Forum." The cooperating suspect described "The Forum" as a site that appeared to be a blog but once logged into the site it was a forum where people could upload and download images and videos of minors engaged in sexual activity.

22.     S/A Kottas conducted a search of the Internet for "The Forum" as described by the cooperating suspect. S/A Kottas found a website with the name of "The Forum" and asked the cooperating suspect if he recognized the website. The cooperating suspect confirmed it was the website which he referred as "The Forum." The cooperating suspect provided verbal and written consent to access the site using his account. The site had several galleries of images and videos sorted in various theme collections, one of which was entitled "Youngsters Club." According to the cooperating suspect, a member was required to post 10 videos to "The Forum" in order to gain access to the Youngsters Club. The cooperating suspect had met the requirements and was a member of the Youngsters Club. Insp. Versoza accessed "The Forum" during the interview. During the preview of "The Forum," Insp. Versoza and S/A Kottas observed thumbnails of pictures/videos that appear to depict minor males engaged in masturbation and thus the lascivious exhibition of the genitals and pubic area. The Youngsters Club appeared to contain sexually explicit videos and images of minor boys taken via webcams. The cooperating suspect stated that in order to gain access into the VIP sections of "The Forum," a member would either have to provide a monetary payment or produce and share child pornography images and videos.

23.     Prior to the conclusion of the interview, the cooperating suspect was given a "Consent to Assume Online Presence" form. The cooperating suspect reviewed the form and gave written consent to turn over his account with "The Forum" to law enforcement.

## C.    REVIEW OF THE FORUM

24.    Subsequent to the second interview of the cooperating suspect, Insp. Versoza and S/A Kottas conducted further review of "The Forum." S/A Kottas learned "The Forum" provided a link to a blog self-identified as a project of "The Forum." The blog provided an explanation for the purpose of "The Forum." The following is, in part, the explanation:

> "Many of the captures here have been recorded by making use of so called fake-cams. The boys were faced to a simulation of a reality that does not exist. There acting was led by pure illusion. In most cases this illusion appeared as a pretty girl. However, this illusion is nothing but a matrix, a program running on a computer that intends to hijack the boys into an illusory world…"

25.    In addition, "The Forum" revealed postings indicating "The Forum" had been operating for approximately five years and the members were dedicated to the recording and posting of webcam videos of boys nude and/or masturbating from chat sites such as Cam4, Stickam, Chaturbate, Omegle and others. The postings claimed the forum had collected approximately 5 terabytes of videos within the five years.

26.    "The Forum" had numerous video and image galleries that required various membership levels to access. The basic membership level allowed access to the Matrix gallery. Credits could be earned by members either by posting original webcam videos or by donating money to "The Forum" for the upkeep of the servers. Members who uploaded ten or more videos, such as the cooperating suspect, could then gain access to the "Youngsters Club" gallery which featured videos of prepubescent boys engaged in masturbation.

27.    On October 30, 2013, Insp. Versoza logged into "The Forum" and searched the Youngsters Pics section. Insp. Versoza observed images he believed depicted child

pornography.  For example, embedded in one of the posts entitled "sexy danny" was a series

containing four images, of what appeared to be a minor approximately 13 or 14 years of age.

The first image posted depicted what appeared to be a minor boy with his mouth open and his

naked legs are raised.  In the picture, the boy is seen angling his mouth toward his exposed

genital area.  The second image was of the same boy, with his erect penis exposed to the camera.

In this second image, the boy held a cylindrically shaped object near his exposed penis.  The

third image depicted the same boy with his erect penis exposed to the camera while the boy is

smiling at the camera.  The fourth image depicts what appears to be the same boy, this time on

back with his legs in the air and thus exposing his naked anus and genitals to the camera.

28.     Investigation revealed that in or about January 2014, "The Forum" changed the

way members could gain access to the video and image galleries.  Due to the lack of original

posting of videos, members are now required to purchase one year subscriptions to each gallery

they are interested in accessing.  The approximate cost of each gallery is $50 Euros.  The

administrator of "The Forum," "Athemis," claimed the payment for the galleries would be used

to cover the cost of migrating to cloud based storage services.  "Athemis" claimed the cloud

services would allow for upwards of 11 terabytes worth of material to be made available to

members both on computer and mobile devices.

29.     Insp. Versoza conducted research of the domain registry and learned "The

Forum" is hosted in Germany.

30.     Investigation revealed that the Western Digital "My Cloud" Personal Storage

Device is a movable external hard drive which is marketed as a "personal cloud" and allows the

owner to keep all their content in their own control such as in a residence or office but also

allows access to the content from anywhere using the internet.  Once the My Cloud" Personal

Storage Device is connected to an internet connection, users are able to use a "My Cloud" Desktop app, which allows access via a desktop computer system, or the "My Cloud" Mobile App, which allows access from a mobile device such as a Smartphone or tablet, to the data that is contained on the "My Cloud" Personal Storage Device. This allows a user to access, via the Internet, data from the "My Cloud" Personal Storage Device from any location which has internet access.

### D.   UNDERCOVER ACTIVITIES

31.     Beginning on October 28, 2013, Insp. Versoza established an undercover ("UC") account and requested and was granted membership to "The Forum." In an effort to gain access to the image and video galleries a private message was sent to the administrator of the forum, "Athemis." Insp. Versoza asked "Athemis" if there was a way to send a donation via the mail. Over the course of several private messages and after discussing various electronic methods, "Athemis" agreed to have the donation sent to him directly via mail. "Athemis" provided a mailing address located in Berlin, Germany. In addition, "Athemis" identified himself as Klaus VON DER HEIDE for the purpose of receiving the monetary donation via the mail.

32.     On or about January 7, 2014, Insp. Versoza mailed a $50 United Stated Postal Service International Money Order to VON DER HEIDE at the Berlin mailing address.

33.     On or about January 11, 2014, VON DER HEIDE sent a private message to the UC account. The message indicated that the money had arrived to him in Germany.

34.     On or about January 15, 2014, VON DER HEIDE sent a private message to the UC account. VON DER HEIDE indicated that the bank fees to cash the check were too high and asked if he should return the check.

35. On or about January 29, 2014, VON DER HEIDE sent a private message to the UC account. VON DER HEIDE wrote that he was going to be in New York from March 2, 2104 to March 8, 2014, and while there, he would cash the check to avoid the fees. In addition, he provided a hyperlink to a posting he made on "The Forum" regarding donations from the United States. The posting stated that" due to transaction fees and concerns with anonymity," members from the United States could mail the donations to his hotel in New York and/or hand deliver the money if the members were in the area. VON DER HEIDE instructed the members to send him a private message and he would provide the name of the hotel he would be staying in New York.

36. After reviewing the post, S/A Kottas sent a private message to VON DER HEIDE and asked for the name of the hotel and the name he would be registered at in order to send money to him while he was in New York. VON DER HEIDE replied that he would be staying at the Edison Hotel, located 228 W. 47th St, New York, New York and that he would be registered under the name Klaus VON DER HEIDE. VON DER HEIDE stated he would be arriving on March 2, 2014 and departing March 8, 2014.

### E. ACCESS AND REVIEW OF BOY_GALLERYS_III ARCHIVE

37. On or about February 14, 2014, S/A Kottas sent a private message to VON DER HEIDE from the undercover account. S/A Kottas had previously downloaded the Western Digital cloud application as instructed by VON DER HEIDE from postings on "The Forum." S/A Kottas asked VON DER HEIDE for the link to "The Forum" cloud server in order to access "The Forum" archive files. VON DER HEIDE responded to the private message with an activation code. The activation code had an expiration date of February 16, 2014.

38.     On or about February 18, 2014, S/A Kottas sent a private message to VON DER HEIDE informing him the activation code had expired prior to seeing the message and asked if he could resend an activation code.

39.     On or about February 19, 2014, VON DER HEIDE responded to the private message providing a new activation code for the cloud server. Insp. Versoza entered the activation code into Western Digital application. Subsequent to entering the activation code, "The Forum" public files were visible. The public files were files that did not require a monetary purchase and/or donation. Insp. Versoza reviewed the public files and did not find images or videos of what he believed depicted child pornography.

40.     After activating "The Forum" cloud files, S/A Kottas sent a private message to VON DER HEIDE stating the cloud application was set up. S/A Kottas then wrote the following message:

41.     "Question…since you are going to be able to finally cash the check without all the fees when you are in New York is there any way you would give me advance credit?  I would really like to access the Boys Gallery III. The preview pics are great and I would like to see the videos. I think the age of the boys are perfect. Let me know. I would be really grateful. I also have some cash to give to you when you are in New York."

42.     S/A Kottas then sent another private message and clarified the archive was entitled Boy_Groups_III. VON DER HEIDE responded, "This Archive will cost Fees after it going online from 29.95 Euro..because they are very rare Vids…if you will spend it…you get the Archive. The Hot and Innocence Archiv will have the same price. Greetz, Athemis." A short time later, VON DER HEIDE sent a private message asking "what about the Archiv (Boy_III) you want it now?"

43.     S/A Kottas responded to the message stating "I would love boy_groups_III now if its possible.  I know you haven't been able to cash the check, but once you do it could be used for that archive fee?  Like I mentioned I have cash set aside to give to you when here are in the States."  VON DER HEIDE responded "No problem...I trust you.  I give you the Access...Greetz, Athemis"

44.     Pursuant to the receiving the private message from VON DER HEIDE, indicating he was granting access to the Boy_Groups_III archive file, Insp. Versoza logged into "The Forum" cloud account.  Insp. Versoza and S/A Kottas discovered a new file folder was now visible in the account.  The file folder was entitled Boy_Groups_III.  Insp. Versoza and S/A Kottas reviewed the folder and determined the folder contained image and video files depicting minor boys engaged in masturbation and sexual activity.  The following is a description of three of the videos:

45.     The video file titled "german Boys on Cam" depicts what appear to be two naked prepubescent boys, approximately 12 years old.  The video depicts the minor boys engaging in oral copulation on each other and exposing their genitals. The video is approximately 13 minutes and 15 seconds in duration.

46.     The video file titled "Blonde_Black_Boys" depicts what appear to be prepubescent boys, approximately 12 years old.  The video depicts the boys exposing their genitals.  In addition, the boys masturbate each other, rub their penises together, and perform oral copulation on each other.  The video is approximately 34 minutes and 29 seconds in duration.

47.     The video file titled "2 bro's wank" depicts what appear to be one naked prepubescent boy, approximately 10 years old, and one naked prepubescent boy, approximately

12 years old. The video depicts the minor boys engaging in masturbation and exposing their genitals to the video camera. The video is approximately 12 minutes and 10 seconds in duration.

48. On or about February 20, 2014, S/A Kottas provided me with the activation code, which had been provided to by VON DER HEIDE, to access the videos which corresponded to the Boy_Gallerys_III archive file on the "The Forum" cloud server. Upon connecting to "The Forum" cloud archive, I noted his undercover computer system made a TCP/IP connection to the IP address 91.66.184.131. I conducted a search regarding the IP address (91.66.184.131) and found the IP location resolved to Berlin, Germany. I proceeded to download the contents of the Boy_Gallerys_III archive to include the files which were previously downloaded by Insp. Versoza and S/A Kottas.

49. On or about February 24, 2014, Insp. Versoza logged into "The Forum" using the UC account and sent a private message to VON DER HEIDE. The message to VON DER HEIDE stated, in part, that he would be in New York for business during the same time period as VON DER HEIDE. Insp. Versoza asked if VON DER HEIDE was traveling for business or holiday. VON DER HEIDE replied that he traveling to New York to shop for clothing. VON DER HEIDE stated he was a bodybuilder and it was difficult for him to find clothes his size in Europe. Insp. Versoza then asked if VON DER HEIDE would like to meet while he was in New York. VON DER HEIDE replied "Why not. If you not from the Police…I don't scare…hehehe." Insp. Versoza replied he was not a police officer and would send him a message regarding his travel plans.

50. On or about February 26, 2104, S/A Kottas logged into "The Forum" using the UC account and sent a private message to VON DER HEIDE. The message stated, in part, that the UC would be in New York Tuesday and Wednesday (March 4, 2014 through March 5,

2014). The UC asked if they could meet on one of those days in order to give him money and asked how we could communicate. VON DE HEIDE replied that he would be staying at the Edison Hotel from Monday (March 3, 2014) to Saturday (March 8, 2014). VON DER HEIDE suggested they meet in the lobby of his hotel at a time that was best for me. VON DER HEIDE stated that the UC could email him at matrix_herold@arcor.de should the UC needed to contact him. VON DE HEIDE also stated he would bring his "tablet" and could check the private messages when he was connected to WiFi. The UC asked if the meeting could be at 9:30am and provided VON DER HEIDE with a cellular telephone and email address for communication purposes. In addition, the UC asked what VON DER HEIDE looked like so that they would recognize him when they met. VON DER HEIDE described himself as a "big German guy (185cm) without hair" who likes to wear a hat.

## F.    IDENTIFICATION OF VON DER HEIDE

51.     On or about February 21, 2104, S/A Kottas emailed a DHS Summons for guest records, related to VON DER HEIDE, and believed to be maintained at the Hotel Edison, located at 228 W. 47th Street, New York, New York 10036, to SA Regan Madonia, of the ICE-HSI SAC New York office.

52.     On or about February 24, 2014, SA Luanne Walter served the Hotel Edison Summons. SA Walter spoke to Daniel O'Brien, the Directory of Security for the Hotel Edison. Mr. O'Brien confirmed that an individual identified as Klaus VON DER HEIDE had a reservation for a five night stay at the hotel from March 3, 2014 to March 8, 2014. Mr. O'Brien informed SA Walter the reservation was made through a third party, Expedia.com.

53.     On or about February 24, 2014, S/A Kottas reviewed a DHS database travel record for an individual identified as Klaus VON DER HEIDE.  The following is some of the information contained within the travel record:

Citizenship: Germany

Passport Number: C3HZW1P77

Passport Issuance Date: 10/28/2011

Telephone: 4901775631560

Email Address: matrix_herold@arcor.de

IP Address: 91.66.184.131

Location: Berlin

Country: DE (Germany)

54.     On or about February 25, 2104, S/A Kottas obtained a DHS Summons for Expedia.com for records related to the travel reservation of VON DER HEIDE.  I made contact with Expedia Litigation Paralegal Marjorie Martin who instructed me to email the DHS Summons directly to her for review.  I emailed the DHS Summons to Marjorie Martin and included S/A Kottas in the email communication.

55.     On or about February 26, 2014, Marjorie Martin provided to S/A Kottas a response to the DHS Summons.  S/A Kottas reviewed the response and learned on or about January 23, 2014, VON DER HEIDE made a flight reservation and a hotel booking for a trip to New York, New York.  The reservation provided the following information:

Account Holder:

Name – Klaus Von Der Heide

Email – matrix_herold@arcor.de

Phone – 49 (030) 91491470

Payment Details:

Payment Type – Visa

Name – Klaus Von Der Heide

Issuer Name: Comdirect Bank AG

Primary Phone – 49 410670413

Secondary Phone – 49 6966571295

Billing Address – Paretzerstr.4, Berlin, Germany 10713

IP Data:

IP Address - 91.66.184.131

City – Unterfoehring

State – Bayern

County – DE

Carrier – Kabel Deutschland Vertrieb Und Service GMBH

Hotel Details:

The Edison Hotel

Check In – 3/3/2014

Check Out – 3/8/2014

56.     During the review of the Expedia response, the billing address, Paretzerstr.4,

Berlin, Germany 10713, was the same address VON DER HEIDE had provided as a mailing

address to receive the monetary donation from Insp. Versoza.  In addition, the IP address,

91.66.184.131, was the same IP address I made a TCP/IP connection to while accessing The

Forum cloud archive files which resolved to Berlin, Germany.  S/A Kottas also recognized that

the IP address and email address (matrix_herold@arcor.de) were also contained with the DHS travel record described previously.

### G.    MEETING WITH KLAUS VON DER HEIDE

57.    From speaking with Insp. Versoza, reading his reports, and from the surveillance I conducted of the meeting, I know the following:

58.    On March 4, 2014 at about 930am, in an undercover capacity, Insp. Versoza met with VON DER HEIDE at the Hotel Edison in New York City, New York.  Insp. Versoza digitally recorded the conversation.

59.    Insp. Versoza met with VON DER HEIDE at the lobby of the Hotel Edison. VON DER HEIDE was seated in the far corner of the lobby.  Insp. Versoza introduced himself and called VON DER HEIDE by his name "Klaus."  VON DER HEIDE responded to the name "Klaus." Insp. Versoza had a conversation with VON DER HEIDE.   VON DER HEIDE stated that he has never been in the US and he was here for work as he works as a bodyguard for an executive who does business in the fashion industry.   He said he has a permit to carry a gun in Germany but did not have a gun while in the US.

60.    Insp. Versoza then asked him about his screen name "Athemis" and what it meant.  He told Insp. Versoza that it had no meaning.  It was just a name he liked to use.  Insp. Versoza then asked him about "The Forum."  He said that he has had the "The Forum" for five years.  He managed "The Forum" by himself and built it himself.  He said he used to use a NAS server with one terabyte of space, which also functioned as his own personal computer but doing so made the computer very slow.   He said that was the reason he decided to use a cloud server. VON DER HEIDE said he bought a Western Digital Cloud server ("WD server") to host his files, which he said was very secure and because it is a direct connection, it was secure from the

snooping of intelligence agencies like NSA. He said that the WD server was very cheap and held a lot of space. When asked about his bandwidth, he said that he paid for a special type of Internet connection that gave him 150MBPs of bandwidth. He was not sure if that is upload or download speed.

61.    Insp. Versoza and VON DER HEIDE then started talking about the "The Forum." Before we did, he pulled out the $50 money order Insp. Versoza previously mailed him. He said he was not able to cash it as the fees were too high. Insp. Versoza told him to take it to any post office while he is in the US. Insp. Versoza told him that the post office does not charge any fees to cash the money order. He kept the money order.

62.    Regarding the videos on the "The Forum", VON DER HEIDE said that he produced most of the videos on the board. He said he did not feel bad because the kids were not abused, rather that the kids on the board made the videos out of "fun." He used a software called "Camtasia," to capture the camera streams, which he said cost about $300-$500. He then said that he used a pirated copy. VON DER HEIDE stated that if Insp. Versoza was interested, he could put the software on the cloud and share the software with me. He stated that Insp. Versoza would just have to search for an activation key online.

63.    VON DER HEIDE then logged into "The Forum" using his laptop identified with serial number 275558235000498 Insp. Versoza, observed that he used the SUBJECT DEVICE to log onto "The Forum" and access various sections of "The Forum." Insp. Versoza reminded him that if he remembered their previous conversation, Insp. Versoza was interested in preteens aged child pornography. He then started showing Insp. Versoza parts of the bulletin board to include forum sub-categories such as Youngsters, Omegle and others that VON DER HEIDE believed contained child pornography containing young teen and preteen boys. Insp. Versoza asked him

about the cost to get access to those sections of the forum. VON DER HEIDE said that it is 29.95 euros. Insp. Versoza asked him how much would that cost in U.S. dollars. He said he did not know. Insp. Versoza asked if $40 sounded right and he agreed. He also added that he would put the youngest videos into a special section that he will make accessible to me. Insp. Versoza then gave him $100 in U.S. Postal Money Orders and left the area.

## H.   ARREST OF VON DER HEIDE AND THE SEIZURE OF THE SUBJECT DEVICES

64.     On March 4, 2014, after his meeting with Insp. Versoza and on his way back to his hotel room, USPIS and HSI agents arrested VON DER HEIDE. On his person was the Sony laptop computer, with serial number 275558235000498 he used during his meeting with Insp. Versoza along with an LG Cell Phone, with a serial number 107KPED087260.

65.     Immediately after VON DER HEIDE's arrest, he advised that he would allow law enforcement to search his hotel room. VON DER HEIDE was presented with a consent to search form in which he read the form and had it read aloud to him. VON DER HEIDE verbally stated that he understood the form and signed the form.

66.     USPIS and HSI agents searched VON DER HEIDE's hotel room and located electronic storage media to include a Fujifilm Camera FinePix S4400 containing a 16 GB disc, with a serial number 2UG62662, and a ODYS LOOX Plus Tablet, with a serial number 470721370341. In addition, Daniel O'Brien, the Directory of Security for the Hotel Edison, turned over to agents a seal letter received at the hotel addresses to VON DER HEIDE, which was where "Athemis" advised to send letters to for money payments while he was in New York.

## CONCLUSION

67.     Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe the items listed in separate Attachments A, a Sony

laptop computer, with serial number 275558235000498, a Fujifilm Camera FinePix S4400 containing a 16 GB disc, with a serial number 2UG62662, a LG Cell Phone, with a serial number 107KPED087260, a ODYS LOOX Plus Tablet, with a serial number 4707213703415, and a sealed letter addressed to Klaus Von Der Heide, contain evidence related to the production, advertisement, promotion, transportation, possession, or access with intent to view child pornography, and attempt of the same, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A, as well as contain evidence related to the identity of the person known as "Athemis," who has been identified as the lead administrator of an Internet bulletin board that is, in part, dedicated to the trading of images of child pornography.  Additionally, there is probable cause to believe that that such evidence, listed in Attachment B to this affidavit, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

68.     Your affiant, therefore, respectfully requests that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

Brian Bone
Postal Inspector
**MAR 19 2014**  .US Postal Inspection Service

Sworn and subscribed before me this ___ day of March, 2014.

THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

## ATTACHMENT A – ITEMS TO BE SEARCHED

An ODYS LOOX Plus Tablet, with a serial number 4707213703415, which is currently

in the custody of the United States Postal Inspection Service, 1400 New York Ave. NW,

Washington, DC.

## ATTACHMENT B – ITEMS TO BE SEIZED

The following items to be seized constitute contraband, fruits, and evidence of violations of Title 18, United States Code, Sections 2251, 2252 and 2252A found on the property described in Attachment A or relate to the identity of an individual identified as "Athemis," the lead administrator of an Internet bulletin board dedicated, in part, to the trading of images of child pornography:

    a.    visual depictions of minors engaged in sexually explicit conduct;

    b.    evidence of or pertaining to the production, advertising, promotion, transportation, accessing with intent to view, and possession of such visual depictions of minors engaged in sexually explicit conduct, including child erotica, in or affecting interstate or foreign commerce;

    c.    Evidence of user attribution showing who had dominion, ownership, custody, or control of the digital media device corresponding to any evidence described in "a" or "b."

    d.    Information, correspondence, records, documents or other materials constituting evidence of or pertaining to items "a", "b" or "c" above, including, but not limited to:

        i.    correspondence or communications, such as electronic mail, chat logs, or other written communication;

        ii.    Internet usage records, user names, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, account, and subscriber records, membership in online groups, clubs or services, connections to online or remote computer storage;

        iii.    diaries, calendars, address books, names, and lists of names and addresses of individuals who may have been contacted by computer and internet websites; and

        iv.    shared images, "contacts' lists," and image "thumbnails."

All of the items listed in "a" through "d" above include in whatever form and by whatever means they may have been created or stored on the ODYS LOOX Plus Tablet, with a serial number 4707213703415, as described in separate Attachment A.

## ATTACHMENT C (SEARCH PROTOCOL)

To the extent practical, if persons claiming an interest in seized computers or other digital media devices so request, the United States will make available to those individuals copies of the requested files (so long as those files are not considered contraband or evidence as described in Attachment B) within a reasonable time after the execution of the search warrant.  In order to preserve the integrity of the original evidence, these copies will be made from an exact duplicate or a mirror copy of these items, rather than the original evidence.  This should minimize any impact the seizures may have on the computer user's personal and/or business operations. .[1]

If, after inspecting the device or computer system, including all input-output devices, system software, and instruction manuals, the computer specialist conducting the forensic examination determines any of these seized items do not contain evidence of the crimes enumerated in Attachment B, and do not contain or constitute contraband, the United States will return these items.

Only items authorized to be seized will be printed out for evidence purposes.  Other records that may be found on the same storage medium will not be shown to anyone else or printed for any purpose.

In order to preserve the integrity of original evidence, the computer forensics specialist(s) conducting the searches will make duplicate copies or mirror images of any device seized pursuant to these search warrants and any evidence (including images of child pornography or other contraband) will be stored or maintained by the United States until the target/ defendant's appeals and habeas proceedings are concluded.

---

[1] While the United States is not conceding a search protocol is necessary in that they are not required by the Constitution or Rule 41, pursuant to the Court's instructions, and in the abundance of caution, the United States submits Attachment C to this warrant "Search protocols are not required by the Constitution or Rule 41 and often create more problems than they solve.  [E]x ante restrictions on the execution of computer warrants are constitutionally unauthorized and unwise. The Fourth Amendment does not permit judges to impose limits on the execution of warrants in the name of reasonableness." Orin S. Kerr, *Ex Ante Regulation of Computer Search and Seizure*, 96 Va. L. Rev. 1241, 1242 (2010). Any significant limitation (such as a restriction to keyword searches) on the techniques the government may use to find evidence that falls within the scope of a warrant is inconsistent with Supreme Court precedent. The Supreme Court has held that "[n]othing in the language of the Constitution or in [the Supreme Court's] decisions interpreting that language suggests that, in addition to the requirements set forth in the text [of the Fourth Amendment], search warrants also must include a specification of the precise manner in which they are to be executed." *United States v Grubbs*, 547 U.S. 90, 98 (2006) (*quoting Dalia v. United States*, 441 U.S. 238, 255 (1979)). "It would extend the Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the court must set forth precisely the procedures to be followed by the executing officers." *Dalia*, 441 U.S. at 258. Furthermore, any limitation on the government's ability to find evidence that falls within the scope of a warrant is inconsistent with the rule that "[a] container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause." *United States v Ross*, 456 U.S. 798, 823 (1982).

## ATTACHMENT C – SEARCH PROTOCOL (continued)

If the United States discovers unrelated incriminating evidence, it will return for a separate search and seizure warrant.